## AMERICAN BEARING CORPORATION v. MILWAUKEE DIE CASTING CO.

Circuit Court of Appeals, Seventh Circuit.
April 8, 1929.

No. 4085.

E. W. Bradford, of Washington, D. C., and J. V. Quarles, of Milwaukee, Wis., for appellant.

Arthur. L. Morsell, of Milwaukee, Wis., and J. Lewis Stackpole, of Boston, Mass., for appellee.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. Appellant charged infringement of the first eight claims of Olsen patent, No. 1,302,584, issued May 6, 1919, for method of forming bearings. The defenses were prior use, noninfringement, and lack of invention, and defendant prevailed.

The method, so far as here important, is quite simple. A metal shell is immersed in a bath of molten soldering tin. After the tin is wiped from the outside of the shell, it is placed in a machine, on a base plate that closes one end of the shell. Molten Babbitt metal is poured into the shell, which is then rotated so that the molten metal, being thrown outwardly and upwardly, forms a lining on the inside of the shell. Further processes are not important.

It was developed, and admitted on oral argument, that the centrifugal casting of a Babbitt metal lining upon bronze or other metal, with the soldering tin between, is old; but it is claimed that Olsen discovered that the only way to secure a perfect union or bonding between the metal backing and the metal lining was by introducing the Babbitt metal into the shell and starting the coating process before oxidation of the soldering tin begins, which time Olsen fixed at five, six, or ten seconds after removal of the shell from the molten tin bath.

If it is to be conceded that that was Olsen's discovery and was the basis for his very excellent results, there yet remains a very grave question as to whether that necessary step in his method is in any way disclosed or claimed in his patent. The specification says (italics ours):

"The object of the invention is to provide a method whereby a bearing composed of Babbitt metal or similar metal and a backing of bronze, or other metal *may be produced with great rapidity* and in which the lining is of uniform density and the two metals are integrally and firmly united by a tight bond with uniform adherence throughout their entire surface."

Speaking of the shell, the specification says:

"It is then treated with a suitable acid and dipped in a tank of solder or molten tin so as to completely cover the same, both interiorly and exteriorly, and thereby provide a more effective adhering surface for the Babbitt metal which is to be applied thereto. The shell is then wiped on the exterior to remove excess solder and preserve the shell and its coating substantially concentric."

And, again:

"After the coated shell has been clamped onto the machine the driving mechanism of the latter is connected so as to rotate the carrier, * * * and then the molten Babbitt metal is poured into the shell. * * * In the rotation of the machine, the Babbitt metal will be thrown by centrifugal force against the inner surface of the bronze shell and will effectively cover the entire surface thereof and form a lining, the close coalescence or adherence of which to the surface of the casting will be uniform throughout."

And, further, it is said:

"The present method also enables stock to be turned out with great rapidity."

Although the words "great rapidity" are used twice, their use does not seem to be even remotely connected with or have any relation to the time element between the withdrawing of the shell from the solder tank and the introduction of the Babbitt metal into the shell. The following from the specification is the only language that seems to have any relation to rapidity of production, viz.:

"On the shaft is mounted a brake member 18 which may be manipulated in any suitable manner for the purpose of checking the momentum of the shaft and bringing the parts to a quick stop when the power is thrown off."

The only reference to the handling of the shell in and out of the soldering tank, and into the machine, and the introduction of the Babbitt metal therein, in no way indicates a quick succession of steps, and there is not the slightest intimation that the lapse of time between the removal of the shell from the bath and the introduction of the Babbitt metal is of any importance whatever, or in any way differs in time from any other step.

It seems not possible for appellant to claim, or for the court to hold, that the element of speed in question is covered by the patent.

If it should be conceded that the speed element is covered by the patent, there is the question of infringement.

Olsen testified for plaintiff:

"It is absolutely necessary to consume the least time possible in the interval of time between the taking of the bushing out of the tin bath and placing it in the machine and casting the metal into it; * * * because in the time that is lost there accumulates a film of oxide over the tin which makes it im-

possible for the molten Babbitt to make a perfect union between the liner and the bronze."

He said the maximum time allowed should not exceed three seconds from the time the tinned bronze shell was lifted out of the tin bath, placed into the machine, and the Babbitt poured into it. He also fixed the time within which dangerous oxidation occurs as the fourth, fifth, or sixth second. The evidence shows a lapse of 25 seconds between the removal from the solder bath and the introduction of the Babbitt metal in defendant's practice. The steps detailed on cross-examination indicate that probably that much time was consumed. That would be 15 to 18 seconds after dangerous oxidation would occur, and 22 seconds after the maximum time fixed by Olsen. Obviously, plaintiff could have no protection against a practice that occupied a time far beyond the time of dangerous oxidation. Such a practice could not have infringed.

There was evidence concerning a use by the International Harvester Company by witnesses that appeared before the District Court, and from which the District Court was convinced that a prior use had been established. We see no reason, from an examination of the evidence, to disagree with the conclusion of the District Court thereon.

The decree of the District Court should be, and is, affirmed.